**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x

| | |
|---|---|
| In re: | Chapter 11 |
| | |
| ADVANCED CONTRACTING SOLUTIONS, LLC, | Case No. 17-13147 (SHL) |
| | |
| Debtor. | |

-----------------------------------------------------------------x

ADVANCED CONTRACTING SOLUTIONS, LLC

                              Plaintiff,

                    v.

METALLIC LATHERS AND REINFORCING
IRONWORKERS LOCAL 46, as Sponsors of
Various Fringe Benefit Funds, BUILDING
MATERIAL TEAMSTERS LOCAL 282, as
Sponsors of Various Fringe Benefit Funds,        Adv. Proc. 18-01003 (SHL)
ANGELO ANGELONE, ERIC LEE AND
MICHAEL SALGO as Trustee of the CEMENT &
CONCRETE WORKERS PENSION TRUST
FUND, CEMENT & CONCRETE WORKERS
WELFARE TRUST FUND, CEMENT &
CONCRETE WORKERS ANNUITY TRUST
FUND, CEMENT & CONCRETE WORKERS
SCHOLARSHIP TRUST FUND, KIERAN
O'SULLIVAN as Trustee of the CEMENT &
CONCRETE WORKERS TRAINING AND
EDUCATION TRUST FUND AND BUILDING
MATERIAL TEAMSTERS LOCAL 282, IBT,
THOMAS GESUALDI, LOUIS BISIGNANO,
ANTHONY D'AQUILA (REPLACED BY
TRUSTEE DARIN JEFFERS AS OF JANUARY 1,
2017), MICHAEL O'TOOLE, MICHAEL
BOURGAL, FRANK H. FINKEL, JOSEPH A.
FERRARA, SR., MARC HERBST, DENISE
RICHARDSON, AND THOMAS CORBETT as
Trustees and Fiduciaries of the LOCAL 282
WELFARE TRUST FUND, THE LOCAL 282
PENSION TRUST FUND, THE LOCAL 282
ANNUITY TRUST FUND, THE LOCAL 282 JOB
TRAINING TRUST FUND, AND THE LOCAL
282 VACATION AND SICK LEAVE TRUST
FUND, and JOHN DOES 1 THROUGH 10,
                              Defendants.
-----------------------------------------------------------------x

## MODIFIED BENCH RULING

**A P P E A R A N C E S:**

KLESTADT WINTERS JURELLER SOUTHARD & STEVENS, LLP
*Counsel for Debtor and Debtor-in-Possession*
  By:  Tracy L. Klestadt, Esq.
         Fred Stevens, Esq.
         Brendan M. Scott, Esq.
         Lauren C. Kiss, Esq.
200 West 41st Street, 17th Floor
New York, New York 10036

LOWENSTEIN SANDLER LLP
*Counsel for the Official Committee of Unsecured Creditors*
  By:  Jeffrey Cohen, Esq.
         Eric S. Chafetz, Esq.
1251 Avenue of the Americas
New York, New York 10020

– and –

Kenneth A. Rosen, Esq.
Michael Papandrea, Esq.
One Lowenstein Drive
Roseland, New Jersey 07068

COHEN, WEISS & SIMON, LLP
*Counsel for Trustees of Cement Workers Funds*
  By:  Thomas M. Kennedy, Esq.
         Richard Sletzer, Esq.
         Susan M. Jennik, Esq.
900 Third Avenue
New York, New York 10022

TRIVELLA & FORTE, LLP
*Counsel for the Creditors Trustees and Fiduciaries of the Local 282
Welfare Trust Fund, the Local 282 Pension Trust Fund, the Local 282
Annuity Trust Fund, the Local 282 Job Training Trust Fund, and the
Local 282 Vacation and Sick Leave Trust Fund*
  By:  Christopher Smith, Esq.
1311 Mamaroneck Avenue, Suite 170
White Plains, New York 10605

BRADY MCGUIRE & STEINBERG, P.C.
*Counsel for International Union of Operating Engineers Local*
*14-14B, AFL-CIO and International Union of Operating*
*Engineers Local 15, 15A & 15D, AFL-CIO*
   By:   James M. Steinberg, Esq.
303 South Broadway, Suite 234
Tarrytown, New York 10591

GARVEY, CUSHNER & ASSOCIATES, PLLC
*Counsel for International Union of Operating Engineers Local*
*14-14B, AFL-CIO and International Union of Operating*
*Engineers Local 15, 15A & 15D, AFL-CIO*
   By:   James J. Rufo, Esq.
500 Main Street, Suite 390
White Plains, New York 10606

WESTERMAN BALL EDERER MILLER ZUCKER & SHARFSTEIN, LLP
*Counsel for Signature Bank*
   By:   John E. Westerman, Esq.
         Mickee Hennessy, Esq.
1201 RXR Plaza
Uniondale, New York 11556

BERGER SINGERMAN
*Counsel for Trident General Contracting LLC*
   By:   Isaac M. Marcushamer, Esq.
1450 Brickell Avenue, Suite 1900
Miami, Florida 33131

SPIVAK LIPTON LLP
*Counsel for the New York City & Vicinity District Council of Carpenters*
   By:   James M. Murphy, Esq.
         Gillian Costello, Esq.
1700 Broadway, Floor 21
New York, New York 10019

CULLEN AND DYKMAN LLP
*Counsel for Navillus Tile, Inc.*
   By:   C. Nathan Dee, Esq.
         Elizabeth M. Aboulafia, Esq.
         Jean Pierre van Lent, Esq.
         Elizabeth Usinger, Esq.
100 Quentin Roosevelt Boulevard
Garden City, New York 11530

CHIESA SHAHINIAN & GIANTOMASI PC
*Counsel for Liberty Mutual Insurance Company*
  By:    Adam P. Friedman, Esq.
         Scott A. Zuber, Esq.
11 Times Square, 31st Floor
New York, New York 10036

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is the motion (the "Sale Motion") [ECF No. 122][1] of Debtor Advanced

Contracting Solutions LLC ("ACS")—and its supplemental statement in further support [ECF No.

156]—to sell substantially all of its assets free and clear and subject to higher and better offers.[2]

Through the motion, Debtor seeks authority to sell its concrete construction business.  Through its

motion and a complaint filed in an adversary proceeding, Debtor ACS also seeks a determination

that: (1) it is not a party to any collective bargaining agreement(s) (or CBAs) and that it therefore

has no CBAs to modify or reject under 11 U.S.C. § 1113; or (2), in the alternative, that the

proposed sale does not implicate or offend Section 1113.  *See* ECF Nos. 157, 202; ECF No. 165

(Debtor's complaint seeking injunctive relief in Adversary Proceeding 18-01003).

The backdrop for all of Debtor's requested relief is a decision issued by the United States

District Court for the Southern District of New York on September 20, 2017 in a case called

*Moore v. Navillus Tile, Inc.*, No. 14 CIV. 8326, 2017 WL 6388962 (S.D.N.Y. Sept. 20, 2017) (the

"District Court Decision" or the "Decision").  In that Decision, the District Court issued a ruling

finding that non-union ACS is the alter ego of a construction company called Navillus Tile, Inc.

("Navillus"), and thus liable for non-compliance with the CBAs of Navillus.  *Moore v. Navillus,*

---

[1]        Unless otherwise indicated, all references to the Case Management/Electronic Case Filing ("ECF") docket
are to Case No. 17-13147.

[2]        This written decision memorializes the Court's bench ruling that was read into the record on January 30,
2018 after the conclusion of trial on January 29, 2018.  Because of its origins as a bench ruling, this decision has a
more conversational tone.

at \*27, \*34, \*38, \*45.  As part of that ruling, the District Court held ACS and Navillus to be

jointly and severally liable for a judgment of $73.4M for failure to make required contributions

for ACS projects to certain union-maintained benefits funds (the "Union Funds") under the

applicable Navillus CBAs.  *Id.* at \*45.

As judgment creditors in the Debtor's bankruptcy case, several of those same Union

Funds, together with the Unsecured Creditors Committee (the "UCC" and collectively the

"Objectors"), have objected to the relief sought by the Debtor today.  *See, e.g.*, Cement Workers

Objections, ECF Nos. 125, 137; 207; Local 282 Trust Funds Objections, ECF No. 138, 187; UCC

Objections, ECF Nos. 136, 183.  For ease of reference, the Court will refer to the two main

objecting Unions using the shorthand of the Cement Workers and Local 282, although there are

other objecting Unions as well.  As a practical matter, counsel for the Cement Workers, Cohen,

Weiss & Simon LLP, took the laboring oar at trial for the Objectors—both in presenting the

evidence and arguing the case together with counsel for the UCC.  The Objectors argue that the

District Court Decision represented a finding of alter ego status that remains applicable on a

forward-looking basis and that ACS has failed to make a "bright line" demonstration that things

are different now so as to disentangle ACS from Navillus, meaning that ACS is still bound under

the Navillus CBAs.  The Objectors further contend that the Debtor's assets cannot be sold free of

those CBA obligations because ACS does not satisfy the requirements of Section 1113.  Finally,

the Objectors contend that the Debtor and proposed purchaser do not satisfy the bankruptcy

requirements for a free and clear sale, including those for a good faith purchaser finding under

Bankruptcy Code Section 363(m).

ACS disagrees on all counts.  As a threshold matter, ACS argues that it has no ongoing

obligation under the CBAs because the District Court dismissed with prejudice a claim by certain

plaintiffs in that case that expressly sought a judgment requiring ACS to remain current under the CBAs going forward, and that such dismissal constitutes a res judicata bar to the Unions' current claim for ongoing liability under the CBAs.  But ACS spends far more of its time on its second argument—namely its contention that to the extent it ever was an alter ego of Navillus, that it has now disentangled itself from Navillus.  Thus with its status as an alter ego having ended, ACS is no longer bound to the Navillus CBAs, which therefore do not serve as an impediment to the proposed sale.  Even if it still is bound by the CBAs, however, ACS contends that it has satisfied the requirements under Section 1113 for terminating those CBAs, notwithstanding the unique circumstances of this case.  Finally, ACS contends that it has satisfied all the Bankruptcy Code requirements for a sale, including those for a good faith finding for the proposed purchaser under Section 363(m).

## **BACKGROUND**

### A.  **ACS History and Background**

ACS was formed as a Delaware Limited Liability Company on July 16, 2013.  Sale Motion ¶ 3; *Moore v. Navillus,* at *2.  ACS was founded by Eoin Moriarty as an open-shop concrete foundation and concrete super-structure contractor.  Sale Motion ¶ 5.  ACS currently employs approximately 450 employees, and as many as 700 people during peak times.  Sale Motion ¶ 8.  ACS is currently engaged on fourteen construction jobs across New York City which it estimates have future revenues of approximately $75 million.  Sale Motion ¶ 9.  On average, ACS has annual revenues of in excess of $100 million, and has completed over $250 million in work within the five boroughs of New York City since inception.  Sale Motion ¶¶ 2, 5.  The Debtor was operating a profitable business up until the District Court Decision.  Sale Motion at 2–3.

### B.  **The District Court Decision**

On September 22, 2017, the District Court entered a judgment against ACS, Navillus and other co-defendants, holding ACS and Navillus jointly and severally liable for satisfaction of an award of $73.4 million for a claim by various union benefit funds that ACS was an alter ego of Navillus, a union concrete contractor, and therefore liable to the Union Funds on account of ACS jobs staffed with non-union employees.  *See generally Moore v. Navillus*.  The District Court Decision did not provide for any injunctive relief requiring ACS to remain current on those union benefit funds obligations on a go-forward basis.  *Id.*  ACS is pursuing an appeal of that judgment with the United States Court of Appeals for the Second Circuit.  Sale Motion ¶¶ 11–13.  Between September and November, ACS twice sought and failed to receive a stay on the judgment.  Sale Motion ¶ 12.  The Union Funds subsequently restrained ACS' bank accounts in their efforts to execute upon the judgment.  Sale Motion ¶ 12.

In making its alter ego ruling, the District Court made substantial factual findings regarding the ownership, management, supervision, operation, equipment, business purpose, customers, and union animus of ACS from the date of its formation.  *See generally Moore v. Navillus*.  Many of the findings in the District Court Decision focus on the two years after the formation of ACS in 2013.  *Id.*  For example, Mr. Moriarty listed Peter Downes as ACS' sole member in its registration papers.  *Id., at* *21.  At the time, Mr. Downes was the Vice President of Navillus and the only Navillus corporate officer other than Donal O'Sullivan, which supported the District Court's conclusion that Mr. Downes' name was being used to signal "to those in the industry that ACS was a Navillus entity."  *Id.* at *21.  Sometime after ACS obtained its first major contract, Mr. Moriarty bought out Mr. Downes' interest in the company for a "token payment of $1,000."  *Id.* at *22.

The District Court Decision also found that, from day one, ACS received substantial financial support from Navillus. ACS' filing fees were charged to a Navillus corporate credit card belonging to Helen O'Sullivan (Donal's sister). *Id.* at *21. Mr. O'Sullivan issued three personal loans to Mr. Moriarty in order to finance ACS' expenses. *Id.* at *22. In exchange for these loans, Mr. O'Sullivan received options to purchase at least the majority of the shares of ACS if the company achieved profitability in its first few years of operation. *Id.* at *23–24. The options were to remain in full effect even if Mr. Moriarty repaid the loans prior to their expiration dates. *Id.* at *24. The District Court concluded that "it was always the intention of all parties that Donal O'Sullivan would exercise the options," and "believe[d] the pendency of [the District Court] lawsuit prevented Donal O'Sullivan from exercising the options and the parties from completing the deal to which they had originally agreed." *Id.* at *24.

The District Court also found that Navillus provided significant operational support to ACS through the first few years of its existence. ACS' original mailing address was, in fact, an apartment owned by Kathleen O'Sullivan, Donal's wife. *Id.* at *21. ACS hired as managers over a dozen former employees of Navillus and Navillus-related entities. *Id.* at *24. Navillus even assisted with the provision of health insurance and visa sponsorship for certain ACS executives and employees, including Mr. Moriarty himself. *Id.* at *20, *27.

Significantly, the District Court expressly found that both Mr. Moriarty and Donal O'Sullivan perjured themselves when testifying as to critical facts in the alter ego analysis. *See, e.g., id.* at *23 ("In particular, I do not credit Donal O'Sullivan's testimony that he forgot about holding an option. . . . That is an obvious falsehood. . . . I conclude that Donal O'Sullivan perjured himself in giving both his deposition testimony . . . and his trial testimony."); *id.* ("I also do not credit any of Moriarty's testimony about the options. . . . Moriarty was obviously lying.").

8

The District Court presented its alter ego finding for ACS and Navillus at three locations in its decision, each time utilizing somewhat different language:

- First, the District Court stated that "ACS was set up as, and at all relevant times was, Navillus' alter ego." *Id.* at *27.

- Second, the District Court stated that "[e]valuating the same factors, I conclude that ACS is also an alter ego of Navillus. ACS has substantially identical ownership, management, supervision, business purpose, customers, operations, and equipment as Navillus. Furthermore, the record as a whole demonstrates that the alter ego relationship continued well beyond any 'startup period.'" *Id.* at *34.

- Third, the District Court stated that "[b]ased on these factors, I conclude that ACS and Navillus are, and always have been, alter egos." *Id.* at *38.

### C.  <u>Events After the District Court Decision, Including the Bankruptcy Case</u>

Approximately one month after the District Court Decision—at the end of October 2017—ACS employed CBIZ Corporate Recovery Services ("CBIZ"), to provide a chief restructuring officer (a "CRO") and related support to ACS to assist it in its financial and operational restructuring. Varsalone Supp. Decl. ¶ 1 [ECF No. 213]. Jeffrey T. Varsalone was thereafter designated CRO. *Id.* The retention of CBIZ and designation of Mr. Varsalone as CRO were approved by orders of this Court. [*See* ECF Nos. 84, 132]. Since his appointment as CRO of the Debtor, Mr. Varsalone has served as an executive and officer of ACS. Varsalone Decl. ¶ 11(a) [ECF No. 157-1]. ACS management has delegated responsibility to Mr. Varsalone to manage ACS' bankruptcy case, including the negotiation of ACS' debtor-in-possession lending facility and the management of ACS' sale efforts. *Id.* Mr. Varsalone has access to ACS' books and records and is a signatory on ACS' project-level bank accounts. *Id.* .

Approximately one week after Mr. Varsalone was retained and shortly after its request for a stay on the District Court judgment was denied, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on November 6, 2017 (the "Petition Date"). [ECF No.

1].  The Debtor continues to operate its business as a debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

As of the Petition Date, ACS had an existing secured credit facility with Signature Bank (the "Prepetition Lender").  Sale Motion ¶ 17.  Leading up to and following the first day hearing in its bankruptcy case on November 8, 2017, which included a hearing on Debtor's cash collateral motion [ECF No. 3], ACS and the Prepetition Lender negotiated the terms of a consensual emergency cash collateral order, which was entered by the Court on November 9, 2017 [ECF No. 33].

A second day hearing was held on November 21, 2017, which included a hearing on Debtor's cash collateral motion at which ACS sought authority to use $248,000 of the Prepetition Lender's cash collateral to pay payroll and related expenses through the end of the week.  ACS reported having received an oral commitment from Liberty Mutual Insurance Company ("Liberty") to provide a debtor-in-possession ("DIP") credit facility of approximately $2-3 million.  Sale Motion ¶ 20.  After some negotiation, Liberty also ultimately agreed to backstop the $248,000 in the event the DIP financing was not authorized in order to facilitate the Prepetition Lender's approval of use of its cash collateral.  *Id*.  The Court issued a second order authorizing the limited continued use of cash collateral on November 22, 2017.  [ECF No. 61].

ACS ultimately entered into an agreement with Liberty dated November 29, 2017, providing for a $2.5 million DIP facility.  Sale Motion ¶ 21.  The Court approved the facility on an interim basis [*see* ECF No. 86], upon which Liberty funded the first $1 million advance under the facility.  On December 8, 2017, the United States Trustee appointed a three-member Official Committee of Unsecured Creditors comprising (1) Cement Masons Local 780 Trust Funds; (2) Metallic Lathers & Reinforcing Ironworkers, Local 46; and (3) Construction Risk Partners, LLC.

Sale Motion ¶ 22.  On December 20, 2017, the Court approved the DIP facility on a final basis.
[*See* ECF No. 121].

The DIP facility has shored up ACS' operations, but is only expected to carry the Debtor
through the end of January 2018.  Sale Motion ¶ 26; Varsalone Decl. ¶ 6.  The Debtor does not
have sufficient funds to cover insurance premium payments of approximately $840,000 due on
February 1, 2018 and approximately $450,000 in operating expenses in the first week of February
2018.  Varsalone Decl. ¶ 6.

Accordingly, pursuant to its Sale Motion, the Debtor seeks to sell substantially all of its
assets to Trident General Contracting LLC ("Trident" or the "Purchaser")—whose offer was
subject to higher and better offers—with a closing held prior to the end of January, hence the
expedited nature of the proceeding now before the Court.  Varsalone Decl. ¶ 5.  The Court held a
hearing on January 5, 2018 to consider the auction procedures and bid protections proposed by
the Sale Motion, and issued an order approving those procedures and protections—with
modifications established during the hearing—on January 9, 2018.  [ECF No. 150].  If the sale is
not accomplished, the Debtor anticipates running out of cash and entering a forced liquidation.
Varsalone Decl ¶ 6; Varsalone Supp. Decl. ¶ 46; Sale Motion at 4.  Debtor's CRO attests that
such liquidation will likely entail the conversion of Debtor's bankruptcy to a Chapter 7 case, the
termination of Debtor's approximately 450 employees, and the incurrence of significant liability
to Liberty on the payment and performance bonds it has issued with respect to six of Debtor's
outstanding work contracts.  Varsalone Decl. ¶ 6; Varsalone Supp. Decl. ¶ 45.

The Court held a trial on these issues on January 26 and 29, 2018.  The Court heard
testimony from six witnesses: William Murphy, Patrick Murphy, Jeffrey Varsalone, Christopher
Wu, Eoin Moriarty, and Donal O'Sullivan.  Direct testimony was presented in written form for

William Murphy, Patrick Murphy, Jeffrey Varsalone, and Christopher Wu. Each of the six witness appeared at trial for cross-examination and re-direct examination. Accordingly, the Court includes citations in this decision where there was direct testimony, but, due to the lack of a transcript, not where testimony was presented live. Given the need for an immediate ruling, the Court issued an oral bench decision on January 30, 2018. At the request of the Objectors, the Court now issues this written decision, which constitutes the Court's findings of fact and conclusions of law.

**CONCLUSIONS OF LAW**

### I.    **ALTER EGO**

#### A.    **This Court May Determine the Issues Raised by the Motion and Adversary Complaint**

As a threshold matter, the Court has authority to entertain the Debtor's Sale Motion and requests for related relief. As Judge Wiles explained in *In re HHH Choices Health Plan, LLC*, 554 B.R. 697, 700 (Bankr. S.D.N.Y. 2016), a bankruptcy court has exclusive jurisdiction over the estate and the disposition of its assets. So while a transfer must comply with the substantive requirements of state law—in his case New York's not-for-profit law and in this case the labor laws and law on alter ego—Section 363 permits that any determination that would be made by a non-bankruptcy court in the absence of a bankruptcy case, is made by the bankruptcy court to the extent that it implicates the ability to sell a debtor's assets. *Id.* at 700–01.

#### B.    **Res Judicata**

The Debtor asserts that the Objectors' argument that ACS is the ongoing alter ego of Navillus is barred by res judicata. Specifically, Debtor contends that the issue of ongoing alter ego status was alleged and denied as a part of the District Court Decision.

Res judicata, or claim preclusion, provides that "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Monahan v. N.Y. City Dep't of Corr.*, 214 F.3d 275, 284–85 (2d Cir. 2000) (quoting *Allen v. McCurry*, 449 U.S. 90, 94 (1980)); *Burgos v. Hopkins*, 14 F.3d 787, 789 (2d Cir. 1994) (same)). "The purpose of the doctrine . . . is to promote finality." *In re DeFlora Lake Dev. Assocs., Inc.*, 517 B.R. 587, 594 (Bankr. S.D.N.Y. 2017) (citing *Chase Manhattan Bank, N.A. v. Celotex Corp.*, 56 F.3d 343, 345 (2d Cir. 1995)).

Under federal law, res judicata "'bars later litigation if [an] earlier decision was (1) a final judgment on the merits, (2) by a court of competent jurisdiction, (3) in a case involving the same parties or their privies, and (4) involving the same cause of action.'" *In re Motors Liquidation Co.*, 576 B.R. 313, 321 (Bankr. S.D.N.Y. 2017) (quoting *In re MF Glob. Holdings, Ltd.*, No. 11-15059 (MG), 2014 WL 3536977, at *4 (Bankr. S.D.N.Y. July 17, 2014)) (alteration in original). "The burden is on the party seeking to invoke res judicata to prove that the doctrine bars the second action." *In re DeFlora*, at 595 (quoting *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 126 F.3d 365, 369 (2d Cir. 1997)).

The District Court Decision resolved two consolidated cases which were referred to by that court as the *Moore* Action and the *Gesualdi* Action, respectively. *See* Complaint, *Moore v. Navillus Tile, Inc.*, No. 14 CIV. 8326 (S.D.N.Y.), ECF No. 1; Complaint, *Gesualdi et al v. Navillus Tile, Inc. et al*, No. 15 CIV. 8441 (S.D.N.Y.), ECF No. 11. The two actions were accepted as related and ordered to be conferenced together starting in early January 2016. Memorandum Decision and Order Denying Defendants' Motion to Sever or for Separate Trials ("Consolidation Decision"), *Moore v. Navillus* [ECF No. 204] at 2. In early January 2017, the Court denied a request from certain defendants to sever the claims or provide for separate trials.

13

*Id.* Citing to Rule 42(a) of the Federal Rules of Civil Procedure and finding "a sufficient commonality between the factual allegations and legal claims raised in each complaint," the District Court further affirmatively "consolidate[d] the *Moore* and *Gesualdi* Actions for all purposes." *Id.* at 11.

For its res judicata argument, ACS relies upon the relief requested in the complaint filed in the *Gesualdi* Action.  Complaint, *Gesualdi v. Navillus*, No. 15 CIV. 8441 [ECF 11].  Among other things, plaintiffs in that action requested that the District Court:

> Enter[] Judgment in favor of Plaintiffs against Defendants, jointly and severally, for injunctive relief ordering Defendants to pay all unpaid delinquencies owed to Plaintiffs Funds in an amount to be determined at trial . . . [and require] Defendants to accurately report work covered by a collective bargaining agreement between International Brotherhood of Teamsters Local 282 and Defendants and remain current in contributions to the Funds;

*Id.*, Prayer for Relief at ¶ 4.  Specifically, ACS highlights the plaintiffs' request that the District Court order Defendants to "remain current in contributions to the Funds."  *Id*.  As ACS further notes, the District Court judgment included a verdict awarding specific damages calculated as overdue payment obligations from past hours worked, and explicitly dismissed all other "claims and counterclaims asserted by any party against any other party . . . with prejudice."  *Moore v. Navillus,* at *45.

The Objectors have not directly responded to Debtor's res judicata argument in any of their papers.  Accordingly, the Court is left to analyze the merits of this argument independently.  Applying the prongs of the test for res judicata, there can be no dispute that the District Court was a court of competent jurisdiction.  Rather, the question is (1) whether one set of plaintiffs in a consolidated case can be bound under res judicata for claims brought by another set of plaintiffs in its separate complaint; and (2) whether the dismissal of "all other claims" constitutes a ruling on the merits of the on-going alter ego status.

### 1. <u>Issue 1</u>

The Court has not found an exact procedural match for the current scenario.  But Rule 42(a) is subject to a long-quoted Supreme Court ruling that "[c]onsolidation is permitted as a matter of convenience and economy in administration, but does not merge the suits into a single cause, or change the rights of the parties, or make those who are parties in one suit parties in another." *Hoffman v. Ighodaro*, No. 16CIV0155LAKJCF, 2016 WL 5812666, at *2 (S.D.N.Y. Sept. 28, 2016) (quoting *Johnson v. Manhattan Railway Co.*, 289 U.S. 479, 496-97 (1933)); *Frere v. Orthofix, Inc.*, No. 99CIV.4049(RMB)(MHD), 2000 WL 34511335, at *1 (S.D.N.Y. June 7, 2000) (quoting Moore's Federal Practice § 42.13[2])); *Moore v. Am. Tel. & Tel. Commc'ns, Inc.*, No. 85 CIV. 4028 (RPP), 1990 WL 250145, at *3 (S.D.N.Y. Dec. 21, 1990).

In cases with actions brought by separate plaintiffs, this rule has dictated that courts treat them separately even when the actions are otherwise matching.  *See Cole v. Schenley Indus., Inc.*, 563 F.2d 35, 38 (2d Cir. 1977) ("'Consolidation . . . does not change the rights of the parties in the separate suits. . . . We must therefore consider the jurisdictional basis of each complaint separately.'") (internal citations omitted).  Rather, it takes a true merger of the cases through, for example, the filing of a subsequent consolidated complaint, for the acts of one plaintiff to constrain the rights of another.  *See In re IndyMac Mortg.-Backed Sec. Litig.*, 793 F. Supp. 2d 637, 643–44 (S.D.N.Y. 2011), *aff'd in part sub nom., Police & Fire Ret. Sys. of City of Detroit v. IndyMac MBS, Inc.*, 721 F.3d 95 (2d Cir. 2013) (admitting that "consolidation alone does not merge [two] suits into a single cause" but analyzing how the subsequent filing of an unopposed consolidated complaint by just one plaintiff caused the dropped plaintiff's rights to toll under the relevant statute of repose) (quotations omitted)).

Accordingly, the Court finds that even if the *Gesualdi* plaintiffs might be precluded under res judicata, the dismissal of their claim in the District Court cannot be used to block any other

parties from making the argument that ACS and Navillus have remained and are alter egos to date.

## 2. **Issue 2**

Even assuming that all plaintiffs were bound by the District Court's dismissal of the *Gesualdi* claim, however, the District Court Decision did not resolve on the merits the same cause of action as the one raised by the Objectors.

The scope of the District Court Decision is made clear by a plain reading of its text and a survey of the underlying facts and "transactions" relied upon. *See In re Franklin Indus. Complex, Inc.*, 541 B.R. 14, 42 (Bankr. N.D.N.Y. 2015) ("Whether or not the first judgment will have preclusive effect depends in part on whether the same transaction or connected series of transactions is at issue, whether the same evidence is needed to support both claims, and whether the facts essential to the second were present in the first.") (quoting *Tibbetts v. Stempel*, 354 F. Supp. 2d 137, 149 (D. Conn. 2005)).

 In contrast to the go-forward contention presented by the Objectors, the District Court Decision made a legal finding of ACS' alter ego status from its formation up to, but not beyond, the date the decision was issued.  In making this alter ego ruling, the District Court largely relied upon facts from 2013 and 2014.  These included the details of ACS' formation and corporate registration (*Moore v. Navillus,* at *21), the evolution of its ownership (*Id.* at *22, *24), its financing for its first few years of operation (*Id.* at *22), the location of office space it had used (*Id.* at *21), the ex-Navillus employees it had hired or employed in various capacities (*Id.* at *24), and the operational support it received from Navillus on job sites and in the form of health insurance and employee visa sponsorship (*Id.* at *20, *27).  Finally, in setting the judgment the District Court listed damages owed to the various plaintiffs, awarding specific dollar amounts "representing the total amount of unpaid fringe benefit contributions owed for work performed on

16

ACS projects, along with unpaid interest and liquidated damages." *Moore v. Navillus,* at *45. As will be discussed further below, the question facing this Court necessarily entails "transactions" and evidence that occurred or came into existence after that which was available to and considered by the District Court.

Moreover, while it is true that the District Court dismissed the request for forward-looking relief, including to remain current in contributions to the Union Funds, there is no evidence suggesting that the District Court made a decision on the merits of this question. Instead, the dismissal looks like one based on procedure because the District Court said nothing about the substance of the claim. *See id.* at *45. Such a sparse dismissal does not satisfy the requirement for a final judgment on the merits and, therefore, the Debtor's res judicata argument must be rejected.

### C. Is ACS Still an Alter Ego of Navillus?

Given the Court's ruling on Debtor's res judicata argument, the Court must resolve the parties' dispute as to whether ACS is currently an alter ego of Navillus.

The District Court Decision provides a clear and comprehensive description of the applicable alter ego law. As it explained:

> "The alter ego doctrine provides an analytical hook to bind a non-signatory to a collective bargaining agreement." *Truck Drivers Local Union No. 807, I.B.T. v. Reg'l Imp. & Exp. Trucking Co.,* 944 F.2d 1037, 1046 (2d Cir. 1991). Although developed in the context of the National Labor Relations Act ("NLRA"), the doctrine applies equally to claims brought under ERISA. *Ret. Plan of UNITE HERE Nat. Ret. Fund v. Kombassan Holding A.S.,* 629 F.3d 282, 288 (2d Cir. 2010). "The purpose of the alter ego doctrine in the ERISA context is to prevent an employer from evading its obligations under the labor laws 'through a sham transaction or technical change in operations.'" *Id.* (quoting *Newspaper Guild of NY., Local No. 3 of the Newspaper Guild, AFL-CIO v. NLRB,* 261 F.3d 291, 298 (2d Cir. 2001)). "To protect employee benefits, courts observe 'a general federal policy of piercing the corporate veil when necessary.'" *Id.* (quoting *NY. State Teamsters Conference Pension & Ret. Fund v. Express Servs., Inc.,* 426 F.3d 640, 647 (2d Cir. 2005)).

17

The test of alter ego status is "flexible" and dependent upon the "circumstances of the individual case." *Kombassan,* 629 F.3d at 288 (internal quotation marks omitted) (quoting *Goodman Piping Prod., Inc. v. NLRB,* 741 F.2d 10, 11 (2d Cir. 1984)). Nonetheless, the "hallmarks of the alter ego doctrine include whether the two enterprises have substantially identical management, business purpose, operation, equipment, customers, supervision, and ownership." *Lihli Fashions Corp. v. NLRB,* 80 F.3d 743,748 (2d Cir. 1996) (internal quotation marks omitted) (quoting *Truck Drivers,* 944 F.2d at 1046), *as amended* (May 9, 1996). Not all of these factors need to be present in order to establish that two entities are alter egos, and no single factor is dispositive. *Local Union No. 38, Sheet Metal Workers' Int'l Ass'n, AFL-CIO v. A & M Heating, Air Conditioning, Ventilation & Sheet Metal, Inc.,* 314 F. Supp. 2d 332, 347 (S.D.N.Y. 2004); *see Goodman Piping Prod, Inc. v. NLRB,* 741 F.2d 10, 11 (2d Cir. 1984). Although the presence of anti-union animus or an intent to evade union obligations is relevant to the inquiry—and may, in some instances be sufficient, standing alone, to impose alter ego status—it is not a necessary factor. *Kombassan,* 629 F.3d at 288.

"Although the alter ego doctrine is primarily applied in situations involving successor companies, where the successor is merely a disguised continuance of the old employer, it also applies to situations where the companies are parallel companies." *Mass. Carpenters Cent. Collection Agency v. Belmont Concrete Corp.,* 139 F.3d 304, 307 (1st Cir. 1998) (internal quotation marks and citations omitted). Accordingly, two companies can be found to be alter egos where both companies "exist simultaneously." *Kombassan,* 629 F.3d at 288. The alter ego doctrine is related but "conceptually distinct" from the single employer doctrine, where two nominally separate entities are actually part of a single integrated enterprise. *Bourgal v. Robco Contracting Enters., Ltd.,* 969 F. Supp. 854, 863 (E.D.N.Y. 1997), *aff'd,* 182 F.3d 898 (2d Cir. 1999).

*Moore v. Navillus,* at *29.

In addition to the factors considered for determining alter ego as a matter of first impression, the law also recognizes instances where a party found to have been an alter ego is later deemed to no longer be such. The District Court Decision—and applicable law—make clear that a finding of alter ego status is not necessarily permanent or universal. The District Court Decision itself included alter ego findings for the other defendant entities limited to just one project. *See Moore v. Navillus,* at *29 (concluding that TSC and HDK were alter egos of Navillus for purposes of the Sugar Hill project from approximately March 2012 through the end of 2014, but finding that they were not alter egos of Navillus for any other project). In support of that

finding, the District Court relied on specific factual evidence of Donal O'Sullivan and Navillus'

involvement in that one project. *See id.,* at *29 ("During the Sugar Hill project, TSC and HDK

shared substantially identical ownership, management, supervision, business purpose, and

customers with Navillus.")  The Court found that "[a]fter the completion of the Sugar Hill project,

TSC and HDK sufficiently disentangled their businesses from Navillus such that they ceased

being its alter egos." *Moore v. Navillus,* at *33.

In addition, the District Court noted that "[i]n 2008, the Hon. Shira Scheindlin, ruling on a

motion for a preliminary injunction in a separate case, concluded that, as of the date of her

opinion, Navillus and TSC were not alter egos." *Moore v. Navillus,* at *9 (*see Times Square

Constr., Inc. v. Mason Tenders Dist. Council of Greater N.Y. & Long Island*, No. 07 Civ. 7250,

2008 WL 55116, at *6–*7 (S.D.N.Y. Jan. 2, 2008)).  But clearly that situation had changed by the

time that the District Court reached its own decision in the fall of 2017.

The case law is sparse on what is required to find that alter ego entities have successfully

separated—or disentangled—for the purpose of determining legal liability.  The District Court

Decision highlighted a recent federal district court decision on disentanglement, *Bd. of Trustees of

Plumbers , Pipefitters & Mech. Equip. Serv., Local Union No. 392 Pension Fund v. Humbert*, No.

1:13CV004, 2017 WL 1177505 (S.D. Ohio Mar. 30, 2017).  The court in *Humbert* amended an

earlier ruling upon a motion for reconsideration and found that the two business entities in

question stopped being alter egos after one "was incorporated, [and] the operations entanglement

ceased." *Id.* at *6.  The *Humbert* court stated that such a ruling was necessary without evidence

of entanglement post-incorporation, as "[t]o conclude otherwise would hold [the corporation]

liable for labor obligations long after the two companies became disentangled." *Id.*  Such liability

would be "manifestly unjust" for an entity that was not independently bound by the relevant

CBA. *Id.* "In sum, the [c]ourt decline[d] to conclude that simply because" the entities were alter

egos in 2008, they were "forever" alter egos, "regardless whether the companies' identities almost

entirely diverged as time went on." *Id.*

Neither *Humbert* nor the District Court articulated a specific test or burden for evaluating

disentanglement claims beyond a fresh application of the general alter ego standard. Indeed, the

doctrine appears to be a fairly new one. The only cases that the parties or the Court could find

involved instances where disentanglement was alleged in the same case where the original alter

ego claim was being litigated. For that reason, perhaps, the Objectors argue that ACS has the

burden of proving disentanglement as an affirmative defense. Cement Workers Final Objection ¶

46 [ECF No. 207]. The proponent of an affirmative defense in a civil matter, of course, generally

bears the burden of proving that defense by a preponderance of the evidence. *See, e.g., Crichlow

v. Fischer*, No. 917CV00194TJMTWD, 2017 WL 6466556, at *8 (N.D.N.Y. Sept. 5, 2017),

*report and recommendation adopted*, No. 917CV00194TJMTWD, 2017 WL 6459512 (N.D.N.Y.

Dec. 18, 2017). But that paradigm is an awkward fit here where there is no injunctive relief

requiring ongoing compliance by ACS with the Navillus CBAs but instead a finding significantly

relying upon events in 2013 and 2014.

That said, the relevant precedent suggests that for the purposes of relieving liability, the

facts may need to establish affirmative disentanglement, rather than simply show that the alter ego

test, if freshly applied to the current window of examination, would not independently result in

the same finding. *See, e.g., N.L.R.B. v. Hebert Indus. Insulation Corp.*, 141 F.3d 1152, at *5 (2d

Cir. 1998) (affirming a finding by the National Labor Relations Board that the contractual liability

continued for an alter ego entity subsequent to the supposed severing of ownership ties because

other operational and financial connections remained). Even the dissolution of the initial entity

may not be enough by itself to eliminate contractual obligations established as a result of an earlier alter ego finding. *See Local 288 Int'l Bhd. of Elec. Workers v. CCT Corp.*, No. C032052LRR, 2005 WL 1277784, at *12–13 (N.D. Iowa May 25, 2005) ("The court therefore finds ACEC's argument CCT's sale and/or cessation of doing business terminated ACECs relationship with or obligations to the IBEW is without merit.").

Given the relevant case law and following the pragmatic factual approach utilized by the District Court, the Court evaluates Debtor's claim that it has successfully disentangled itself from Navillus by applying the traditional alter ego standard. *See Moore v. Navillus,* at *28 (the "hallmarks of the alter ego doctrine include whether the two enterprises have substantially identical management, business purpose, operation, equipment, customers, supervision, and ownership.") (quoting *Lihli Fashions Corp. v. NLRB,* 80 F.3d 743,748 (2d Cir. 1996)).  But this Court shall do so with the recognition that the District Court Decision is entitled to res judicata effect and its findings cannot be challenged in this proceeding.  Taking the District Court's Decision as an article of faith then, the Court will place emphasis on what has *changed* compared to the facts relied upon in the District Court Decision.  Consistent with the District Court Decision and applicable case law, the Court here will address each factor in turn, and make its final determination by evaluating their aggregated weight. *See Div. 1181 Amalgamated Transit Union-New York Employees Pension Fund v. New York City Dep't of Educ.*, No. 13-CV-9112 (PKC), 2017 WL 3738741, at *3 (S.D.N.Y. Aug. 30, 2017) ("The inquiry 'depends on the totality of the facts.'") (quoting *Trustees of the New City Dist. Council of Carpenters Pension Fund v. Integrated Structures Corp.*, 595 Fed. Appx. 15, 17 (2d Cir. 2014) (summary order)).

### 1.    <u>Application of the Alter Ego Test to the Current Facts</u>

Before addressing each alter ego factor, the Court first addresses the parties' disagreement about the relevance of the bankruptcy case for purposes of the alter ego analysis.  The Debtor contends that the act of filing this bankruptcy is—in and of itself—an event that constitutes a sufficient change in circumstances so as to disentangle ACS from Navillus.  The Objectors disagree, focusing instead on the ACS construction work that was the subject of the District Court's Decision and viewing a sale of Debtor's assets in bankruptcy as a potentially significant event only after it occurs.

The Court agrees that the filing of a bankruptcy case is a significant event in the life of any company, including ACS.  Indeed, the law distinguishes between the debtor before and after the filing.  *See In re Chateaugay Corp.*, 102 B.R. 335, 354 (Bankr. S.D.N.Y. 1989) ("The debtor-in-possession is viewed as a separate legal entity from the pre-petition debtor and is empowered 'to take all steps necessary to solve the problems created by the debtor's operation of the business in the past.'") (internal citations omitted); *see also In re Genuity Inc.*, 323 B.R. 79, 82 (Bankr. S.D.N.Y. 2005) (noting that "[t]raditionally, there has been no crossover of claims [for purposes of setoff] because the debtor and the debtor-in-possession are two separate and distinct entities which act in different capacities pre- and post-petition.").

A debtor-in-possession is authorized under 11 U.S.C. § 1107 to exercise the rights, powers and duties of a trustee in bankruptcy. Moreover, unless ordered otherwise, debtor-in-possession is empowered under 11 U.S.C. § 1108 to operate the debtor's business.  *In re Photo Promotion Associates, Inc.*, 72 B.R. 606, 610 (Bankr. S.D.N.Y. 1987).

A debtor-in-possession owes the same fiduciary duty as a trustee to the creditors and the estate. *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985); *In re*

22

*Centennial Textiles, Inc.*, 227 B.R. 606, 612 (Bankr. S.D.N.Y. 1998). The trustee's fiduciary obligations also fall upon the officers and managing employees who conduct the debtor-in-possession's affairs. *Weintraub*, 471 U.S. at 355–56; *In re Centennial Textiles*, 227 B.R. at 612; *see generally* 7 Lawrence P. King, et al., Collier on Bankruptcy ¶ 1107.02[4], at 1107–13 (15th ed. rev. 1998). Indeed, the willingness to leave the debtor-in-possession of its assets rests upon the assurance that its managers will carry out these fiduciary responsibilities. *Wolf v. Weinstein*, 372 U.S. 633, 651 (1963); *In re V. Savino Oil & Heating Co.*, 99 B.R. 518, 526 (Bankr. E.D.N.Y. 1989).

As fiduciaries, the debtor-in-possession and its managers are obligated to treat all parties to the case fairly, maximize the value of the estate (*In re Centennial Textiles*, 227 B.R. at 612 (citing 7 Collier ¶ 1107.02[4], at 1107–12); *In re Central Ice Cream Co.*, 836 F.2d 1068, 1072 (7th Cir. 1987)), and protect and conserve the debtor's property (*In re Sal Caruso Cheese, Inc.*, 107 B.R. 808, 817 (Bankr. N.D.N.Y. 1989)).

In addition to the duties and responsibilities of the debtor-in-possession, the bankruptcy process affords several other protections, including oversight and intervention by the United States Trustee (*see, e.g.,* 11 U.S.C. §§ 307 and 1104), the appointment of statutory committees representing unsecured creditors or equity holders with broad consultation and investigation powers (*see, e.g.,* 11 U.S.C. §§ 1102–1103), and the numerous reporting obligations and overall transparency requirements (*see, e.g.,* 11 U.S.C. §§ 521, 704(a)(8)–(9)).

Sometimes a debtor will hire a CRO before the bankruptcy filing, as was the case here. Such an independent professional will assist a debtor in appropriately carrying out its fiduciary duties to all stakeholders as a debtor-in-possession. *See In re Copenhaver, Inc.*, 506 B.R. 757 (Bankr. C.D. Ill. 2014).

Notwithstanding all this to be the case, the proof is in the pudding.  That means that a debtor and its CRO are not given automatic and advance approval for all their actions.  Instead, they must come back to the Court to seek authority as appropriate, including for actions outside the ordinary course of business like the sale at issue today.  In this particular case, the evidence overwhelming supports that the ACS CRO Jeffrey Varsalone has acted in good faith in carrying out his fiduciary duties, which include running the sale process for ACS' assets, reviewing the Debtor's books and records, and managing the financial affairs of ACS.  His oversight and actions have been and will continue to be a crucial safeguard in this case given the issues raised by the District Court Decision.  This safeguard is further strengthened by the existence of a CRO for Navillus, as that company has also filed for bankruptcy here in the Southern District of New York and whose CRO Mr. Wu testified at the trial in this matter.  While the Court recognizes that both of these CROs have been involved in these companies for a limited amount of time and have focused on the financial—rather than the operational—issues, the Court found their testimony to be credible and helpful evidence on the issues before the Court.  It is against this backdrop that the Court evaluates the alter ego factors.

a. *Union Animus*

The District Court Decision found that there was no evidence of overt anti-union animus on the part of ACS or Navillus.  *See Moore v. Navillus*, at *38.  But the District Court found that no such animus was required to conclude that ACS and Navillus were alter egos of one another because every other factor it examined weighed in favor of finding an alter ego relationship.  *Id.*; *see N.L.R.B. v. G & T Terminal Packaging Co.*, 246 F.3d 103, 118 (2d Cir. 2001) (citing *Goodman Piping,* 741 F.2d 10, 12 (2d Cir. 1984).  This Court also does not find evidence of anti-

union animus.  While this factor is not dispositive, it does constitute one factor in favor of the

Debtor ACS' position.

    *b.  Ownership*

The District Court Decision found common ownership between ACS and Navillus.  It

noted that while Donal O'Sullivan never formally owned ACS outright, he operated as a de facto

owner throughout much of ACS' history and intended to formalize that relationship through the

exercise of stock options, but held back on doing so due to the pendency of the lawsuit.  *See*

*Moore v. Navillus*, at *24, 34.

In its conclusions of law, the District Court discussed extensively the options Donal

O'Sullivan held that would have allowed him to purchase a controlling share of ACS' stock

between April 1, 2014 and April 1, 2017.  *Id*. at *35.  The District Court noted that these contracts

also gave him the power to prevent any of ACS' owners from transferring their shares to anyone

else during this period or otherwise doing anything to negatively affect Donal O'Sullivan's

investment.  *Id*.  The District Court also found Donal O'Sullivan had provided the money behind

ACS and that he was the constructive owner of the company.  *Id*.  He was also the de facto owner

due to his active involvement in two of the ACS construction projects.  *Id*. at *36.

The District Court also noted that ACS' initial owner, Peter Downes was a corporate

officer of Navillus at the same time and had simply been a figurehead at ACS to help it acquire

favorable insurance rates.  *Id*. at *34.  Once this was accomplished, Peter Downes' stake was

bought out at a nominal sum.  *Id*.  The District Court found that he had simply been a stand-in for

Donal O'Sullivan, to disguise the latter's involvement in ACS.  *Id*.

Turning to the record before this Court, the ownership situation has changed.  The options

held by Donal O'Sullivan expired by their own terms on April 1, 2017.  *See Moore v. Navillus,* at

*35; Varsalone Decl. ¶ 12(k).  Peter Downes' ownership of ACS also ended long ago.  Since the

date of the CRO's retention in October 2017, therefore, ACS and Navillus have had no common

owners.  Varsalone Decl. ¶¶ 11(b), 12(d), 12(f).  Eoin Moriarty and William O'Donnell own all of

the equity of ACS and Donal O'Sullivan, directly or indirectly, owns all the equity of Navillus.

Varsalone Decl. ¶ 11(b).

Moreover, given the existence of the bankruptcy and the appointment of a CRO, the

Debtor's prior management—including Mr. Moriarty—no longer has a free hand as to ownership

or the fruits of ownership.  The CRO has been charged with making the decisions during the

bankruptcy proceedings as to the future of ACS, including with respect to the acquisition of

financing and the sale process.  *See generally* Varsalone Supp. Decl. ¶¶ 7–46.  Moreover,

business transactions outside of the ordinary course of business must be approved by the Court.

In addition, the CRO is involved in reviewing the financial circumstances of the business,

including the books and records.  This oversight removes or highly abates concerns over the kind

of ownership arrangements or understandings—such as Mr. O'Sullivan's option—that so

understandably troubled the District Court.

And while the discussion in the District Court Decision on ownership noted that Donal

O'Sullivan had issued loans to finance ACS or that ACS held itself out as affiliated with Navillus

to help secure a contract, the CRO testified that neither Navillus nor Donal O'Sullivan have

provided financial assistance or assistance in obtaining loans, bonds or work since the beginning

of the CRO's employment.  *See* Varsalone Decl. ¶¶ 12(c), 12(h), and 13.  The CRO's basis for

this statement is his knowledge of the finances of the company, including its books and records,

as well conversations he has held with customers.[3]  As of the Petition Date, the projects

referenced by the District Court were also completed.  Varsalone Decl. ¶ 12(j).[4]

Given all these facts, the ownership factor now has significantly changed when compared

with the facts relied upon by the District Court, and these new facts are considerably more

favorable to the Debtor in the alter ego analysis.

c.  *Management*

The District Court Decision found that ACS and Navillus had substantially identical

management.  *See Moore v. Navillus*, at *36.  This conclusion was based on several facts.  First

was the involvement of Donal O'Sullivan, who the District Court referred to as the ultimate

manager.  *Id.*  Second was the fact that Eoin Moriarty, who managed ACS' day-to-day business,

had moved from Navillus to ACS, and the ACS intermediate supervisors had all been former

Navillus managers.  *Id*. at *36.  The District Court noted that more than a dozen members of

ACS' leadership team in the spring of 2014 were former employees of Navillus or related entities.

*Id*.

Since the Petition Date, ACS has not had any common employees with Navillus and has

not hired any former Navillus employees.  Varsalone Decl. ¶¶ 11(e), 12(g), and 13.  But as the

employees that previously moved from Navillus to ACS still remain at ACS, the management

factor still supports a finding of alter ego although this factor is mitigated somewhat by the

passage of time since those employees left Navillus.

---

[3]      The parties dispute whether these customer conversations were the subject of trial testimony or only deposition testimony.  As the Court does not have the luxury of a trial transcript in this expedited matter, the Court cannot be sure; but the Court would reach the same conclusion even if this testimony were not considered.

[4]      While some current ACS projects have the same name as the projects referenced by the District Court Decision, the jobs referenced by the District Court were in Phase 1, while the current projects are in Phase 3 and operate under completely separate and different contracts from those in Phase 1.  Varsalone Decl. ¶ 12(j) n.2.

### d. Supervision

The District Court found that Donal O'Sullivan took an active role in supervising ACS work. The District Court Decision specifically relied upon his involvement with ACS' first job, the Boston Road job. The Decision also mentions involvement in a bid for the 92nd Street job and obtaining a crane for the Kent Avenue project. The Decision concludes by noting that ACS and Navillus had substantially identical supervision in the form of Donal O'Sullivan. *Moore v. Navillus*, at *36-*37.

The CRO attests that, since his retention, he has seen no contractual connection between ACS and Navillus. Varsalone Decl. ¶¶ 12(c), 12(h), 13. He has also not seen any sharing between the two companies of management or employees, no financial assistance, and no assistance in obtaining loans, bonds or work. *See* Varsalone Decl. ¶¶ 12(c), 12(h), and 13. And as previously mentioned, the projects referenced by the District Court all have been completed. Varsalone Decl. ¶ 12(j). The Court is mindful that Mr. Varsalone has been more involved in the financial aspects of the company than with operations at the job sites themselves. Indeed, the CRO testified that he did not go to ACS job sites or know if ACS employees had communications with Donal O'Sullivan, though he also testified that there was no mention of involvement by Donal O'Sullivan in any of his conversations with customers. The Court notes that the Objectors have produced no evidence of recent involvement by Donal O'Sullivan or Navillus in the supervision of ACS work, despite being provided with extensive discovery in this case. The Objectors have instead been content to rely upon the cross examination testimony of Eoin Moriarty that nothing has changed at ACS since the September 20, 2017 date of the District Court Decision. But this does not provide much of a record for assessing the supervision factor for the Court's go-forward inquiry into alter ego. This evidence is therefore not very persuasive on this

factor given that the District Court Decision relied upon evidence from a much earlier time period, a period before there was litigation on this issue, before a CRO and before this bankruptcy. *C.f. Moore v. Navillus*, at *24 (concluding that Donal O'Sullivan did not exercise his ownership option for ACS given the pendency of the alter ego litigation before the District Court).

Given the lack of meaningful evidence on this point, the Court has difficulty assigning much, if any, weight to the supervision factor. *See Kombassan,* 629 F.3d at 288 (noting that the test of alter ego status is "flexible" and dependent upon the "circumstances of the individual case.") (internal citations omitted).

    e.  *Operations*

The District Court Decision concluded that there was substantial overlap in operations between the two companies given ACS' reliance on Navillus' corporate resources. Specifically, during the formation of ACS in 2013, a Navillus credit card had been used to pay ACS' filing fees for ACS' formation and an apartment owned by Donal O'Sullivan's wife was used as ACS' first mailing address. *Moore v. Navillus*, at *21, *37. Moreover, at its inception in 2013, Peter Downes, who was the vice president of Navillus, was listed as the sole member of ACS, solely for the purpose of obtaining favorable insurance rates and financing *Id.* at *21, *34. Donal O'Sullivan also had provided ACS with $1.8 million in initial funds in 2013. *Id.* at *26, *37. And in January 2014, ACS used Navillus' preferred insurer to get a false letter of surety that overstated ACS' prior work experience in order to obtain a contract with CNY Group LLC. *Id.* at *27, *37. From 2013 into 2015, Eoin Moriarty also used Navillus' status as a corporate immigration sponsor to maintain his own visa and Mr. Moriarty also used Navillus' status to secure a visa for another ACS employee. *Id.* at *27, *37. Navillus also continued to provide

health insurance to several employees for months after they formally left the company and moved to ACS, some until 2014 and one into 2015. *Id.* at *27, *37.

As previously noted, however, based on the CRO's review of the Debtor's current books and records and his involvement in ACS' management, he found that there were no contractual or other meaningful connection between ACS and Navillus, no financial assistance from Navillus or Donal O'Sullivan, and no assistance in obtaining loans, bonds or work. Varsalone Decl. ¶¶ 12(h), 13. Peter Downes no longer has ownership interest in ACS and the CRO has never met Mr. Downes during his tenure at ACS. Varsalone Decl. ¶ 12(d). ACS now operates in leased commercial space in the Bronx, New York, approximately 11 miles from Navillus' corporate offices. Varsalone Decl. ¶ 12(e). ACS has its own insurance policies and programs. Varsalone Decl. ¶ 11(h). Navillus no longer pays the health insurance of Mr. Moriarty, and since the Petition Date, ACS has paid the health insurance premiums of all its employees and does not receive financial assistance from Navillus to pay such premiums. Varsalone Decl. ¶¶ 12(b), (i).

It is true that the District Court considered the separate offices of ACS and Navillus—which at the time were located next door to one another—and the existence of separate bank accounts but found them insufficient to overcome the substantial overlap in other operations cited above. Given all the current facts and circumstances, however, the Court finds that this operation factor now has substantially changed in favor of the Debtor.

   f.  *Equipment*

While the District Court Decision noted that not all equipment was shared between ACS and Navillus, the District Court concluded that Navillus and ACS had shared certain important and expensive pieces of equipment. *See Moore v. Navillus*, at *38. Specifically, the District Court cited to ACS' past use of Navillus DOKA concrete forms for the 21st Street project, as well

as ACS' use of cranes on two projects that were acquired with the help of Donal O'Sullivan. *Id.*
Specifically, cranes were leased by ACS from entities owned by Donal O'Sullivan and Navillus
guaranteed a loan for a crane used by ACS on the 92nd Street project. *Id.* Since the Petition Date,
however, Navillus and ACS have not and currently do not share any equipment or other assets.
Varsalone Decl. ¶ 11(f). There has been no evidence provided to the contrary. Accordingly, this
factor weighs against a finding of alter ego between the two companies.

g.  *Business Purpose*

The District Court Decision found that ACS and Navillus had substantially identical
business purposes, which was reflected in their identical business descriptions in their March
2014 financial statements. *See Moore v. Navillus*, at *37. The District Court noted that both
companies were concrete foundation and superstructure subcontractors, though Navillus also
performed other types of subcontracting work as well. *Id.* The District Court noted that two
"entities can have substantially identical business purposes even if one of them performs only a
subset of the business activities of the other." *Id.* (citing *Jacobson v. Metro. Switchboard Co.*,
Case No. 05-CV-2224, 2007 WL 1774911, at *6 (E.D.N.Y. June 18, 2007)).

The Debtor admits that both ACS and Navillus still operate as concrete foundation and
superstructure subcontractors. The Debtor argues that the business purposes of the two
companies are distinct because all the work of ACS is non-union and economically priced as a
result of this fact. Varsalone Decl. ¶ 14. The Debtor also argues that the two companies exist for
distinct business purposes because ACS offers services on private residential high rise
construction protects while Navillus offers services primarily on public projects, thus targeting
different commercial marketplaces.

This Court nonetheless finds that the two companies still have substantially similar business purposes, as both are concrete foundation and superstructure contractors.  This weighs in favor of finding the companies to be alter egos.

### h.  Customers

While the District Court noted that a few customers were unique to ACS, the District Court emphasized that there was substantial overlap between the two companies' customers.  *See Moore v. Navillus*, at *37.  The District Court noted that ACS and Navillus shared at least six major customers and bid on work for the same customers.  *Id*.

The Debtor admits that ACS and Navillus still deal with common general contractors, but argue that this is irrelevant to the analysis because of the limited universe of customers and contractors on major construction projects in New York City.  Supp. Statement in Further Support of Debtor's Motion to Sell Assets ¶ 41 [ECF No. 156].  The Debtor relies upon the following statement in the District Court Decision:

> The evidence in the record suggests that contractors on major construction projects in New York City all deal with a common set of customers—with some projects (including all publicly funded projects) being unionized and an increasing number of projects (including most private residential high rise construction projects) being non-unionized. The same developers appear to operate in both spheres and developers are the ultimate source of business for both general and subcontractors. I do not find this particular factor to be terribly relevant to the alter ego analysis.

*Moore v. Navillus*, at *33.  Notwithstanding this statement, the District Court still concluded that ACS' common customers with Navillus weighed in favor of finding the two companies to be alter egos.  *Id*. at *38.   This Court concludes the same.

### i.  Conclusion

Based on all these factors, the Court concludes that ACS has successfully disentangled itself from Navillus, and is no longer its alter ego for the purposes of liability under Navillus' CBAs.  In particular, the Court finds that the ownership, operations, and equipment factors have

shifted significantly from the time period considered by the District Court in its alter ego

conclusions and, together with the union animus factor, weigh against a finding of alter ego here.

*C.f. Anderson v. Union City Mirror & Table Co., Inc.*, 16-CV-6012, 2018 WL 56572 (S.D.N.Y.

Jan. 25, 2018) (rejecting argument about cherry picking the time period for determining alter ego

given concern of removing any incentive to disentangle).[5]  While the management, business

purpose, and customers factors continue to cut against the Debtor's position, they are less

significant under the facts and circumstances of this case.

## II.    FREE AND CLEAR SALE

### A.  Debtor's Business Judgment

Section 363(b) of the Bankruptcy Code governs the proposed use or sale of estate property

outside of the ordinary course of business.  *See* 11 U.S.C. § 363.  The standard for approval under

Section 363(b) is whether the debtor exercised sound business judgment.  *See In re Glob.*

*Crossing Ltd.*, 295 B.R. 726, 742–743 (Bankr. S.D.N.Y. 2003); *see also In re Borders Grp., Inc.*,

453 B.R. 459, 473–474 (Bankr. S.D.N.Y. 2011).  "The business judgment rule 'is a presumption

that in making a business decision the directors of a corporation acted on an informed basis, in

good faith and in the honest belief that the action taken was in the best interests of the company."

*Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*,

147 B.R. 650, 656 (S.D.N.Y. 1992) (citations omitted).  The case law concerning Section 363

provides that "[t]he business judgment rule's presumption shields corporate decision-makers and

their decisions from judicial second-guessing when the following elements are present: (1) a

business decision, (2) disinterestedness, (3) due care, (4) good faith, and (5) according to some

---

[5]        The *Anderson* case was not included in the Court's original bench ruling, but was brought to the Court's
attention in open court today.

courts and commentators, no abuse of discretion or waste of corporate assets." *In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 464 (Bankr. S.D.N.Y. 2014) (quoting *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992) "Courts are loath to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence … [and] will uphold the board's decisions as long as they are attributable to any rational business purpose … Parties opposing the proposed exercise of a debtor's business judgment have the burden of rebutting the presumption of validity." *Id.* (omissions in original) (citation omitted).

The Court first finds that the business judgment standard is applicable in these cases and that the Debtor has shown that the sale transaction proposed is in the exercise of the Debtor's sound business judgment. The Court finds credible and relies upon the testimony of the CRO, Jeffrey Varsalone, with respect to these matters. The Court also finds that the CRO and the Debtor, in making this decision, acted with disinterestedness, due care, and good faith.

### 1. Decision to Proceed With the Sale Transaction

The Court finds that the decision to proceed with a sale in this case was proper and was appropriately made by the CRO on behalf of the Debtor.

The decision to pursue a sale strategy was made at a meeting on November 8, 2017 between Eoin Moriarty, William O'Donnell and the CRO. Varsalone Supp. Decl. ¶ 7. At that meeting, it was determined that a sale under Section 363 of the Bankruptcy Code was the only strategic option going forward for several reasons. *Id.* First, ACS faced a cash crisis. It became immediately clear to the CRO that without DIP financing, ACS would run out of cash within a week or two. *Id.* at ¶ 8. ACS lost the use of its pre-petition line of credit with Signature Bank and the ability to collect receivables on time because of the strict enforcement of Article 3A of New York Lien Law by general contractors unwilling to make payments to ACS unless they had assurances that the funds would be used to pay vendors holding Article 3A rights. *Id.* This cash

crisis would have led to a near immediate cessation of ACS' business without debtor in possession financing. *Id*. The CRO had serious concerns regarding ACS' ability to make payroll the following week, which would have immediately halted work on ACS' projects and cause other irreparable damage to ongoing operations. *Id*.

Additionally, early in the case the Union Funds asserted that ACS was an ongoing alter ego of Navillus, and thus still a party to the Navillus CBAs. *Id*. at ¶ 9. They further asserted that they had administrative claims for ongoing CBA obligations, which would cause ACS to be administratively insolvent due to the size of the alleged post-petition liabilities owed to the Union Funds; these were estimated by counsel to certain Union Funds on the record of one hearing and in subsequent motion papers to be approximately $710,000 a week. *Id*.

Based on these factors, the CRO decided that if ACS could locate a buyer for its assets at an acceptable price, it would provide a viable exit strategy that would benefit all of ACS' stakeholders. *Id*. at ¶ 10. The CRO believed that if a transaction could at least provide for (1) enough cash to repay secured lenders, (2) the assumption of all liabilities with arguable Article 3A rights, (3) the continuation of ACS' work contracts without breach, and (4) the preservation of some or all of ACS' approximately 450 employees, it would be a good result for ACS and its stakeholders under the circumstances. *Id*.

### 2. Sale Process

To assess the appropriateness of the sale process, the Court focuses on the actions of Mr. Varsalone as the CRO. It is clear to the Court that the sale process pursued by the CRO on behalf of the Debtor was designed to produce the highest and best offer, that the marketing process was fair and open, and that the process was appropriate under the circumstances. The Court finds that while Donal O'Sullivan was responsible for alerting Mr. Murphy to the sale opportunity, this was done at the request of ACS at a meeting at which the CRO was a participant. Indeed, this request

35

by ACS was in keeping with the requirement that the sale process be run in a manner that maximized value, leaving no stone unturned in the search for a viable purchaser. The Court concludes that Navillus or Mr. O'Sullivan did not exercise undue influence on the sale process, which as described below was clearly controlled by the CRO. The factual details behind these conclusions are worth setting forth.

After the November 8th meeting where the CRO decided to pursue a sale, ACS made it immediately known to any interested parties that it was looking for a potential acquirer. Varsalone Supp. Decl. ¶ 11. The CRO and his team at CBIZ revamped the cash flow budget, including compiling detailed sub-schedules, so that any potential DIP lender could be given all of the relevant financial information needed to make a quick lending decision. *Id.*

On November 9, 2017, Eoin Moriarty, William O'Donnell and the CRO, along with ACS' counsel, and counsel for Mr. Moriarty, met with ACS' surety, Liberty and its counsel regarding the possibility of DIP financing from Liberty. Varsalone Supp. Decl. ¶ 12. At that meeting with Liberty, the attendees also discussed strategic options in the Chapter 11 case, including the possible sale of ACS' assets. *Id.* Later on November 9, 2017, the same ACS personnel met with Donal O'Sullivan and Padraig Naughton (an officer of Navillus), along with counsel for Navillus, and counsel for Mr. Moriarty, to discuss strategic options for restructuring Navillus and ACS. *Id.* at ¶ 13. The CRO found it logical to meet with Navillus given the companies' joint and several liability relating to the Judgment and the fact that there had been significant global settlement discussions between ACS, Navillus, and certain Union Funds prior to the commencement of the Chapter 11 case. *Id.* At the November 9, 2017 meeting, the CRO informed the attendees of ACS' need for immediate financing and that a sale of ACS' assets would be in the best interests

of ACS' stakeholders.  *Id.*   Both the CRO and Mr. Moriarty testified at trial that Donal

O'Sullivan was asked at this meeting to see if he could find a buyer for ACS.

On November 10, 2017, the CRO began exploring options for DIP financing from sources

other than Liberty.  Varsalone Supp. Decl. ¶ 14.  He negotiated potential funding from another

finance company and received a letter of intent.  *Id.*  He then searched for alternative financing on

better terms, contacting fifteen other potential lenders, while Debtor's counsel and counsel for the

potential lender drafted the necessary loan documents and pleadings.  *Id.* at ¶ 15.  ACS'

management also continued to search for alternative financing, including with Liberty.  *Id.*

On November 16, 2017, William Murphy met with Liberty and Donal O'Sullivan, among

others, to discuss the potential terms for purchasing certain of ACS' assets.  William Murphy

Decl. ¶ 9 [ECF No. 217-1].  At the time, the CRO was not aware of and did not participate in this

meeting.  Varsalone Supp. Decl. ¶ 17.[6]

Also on November 16, 2017, the CRO participated by telephone in a meeting with Liberty

and its counsel, Donal O'Sullivan, and Eoin Moriarty during which they discussed the potential

for Liberty to provide DIP financing on terms similar to those provided to Navillus in its chapter

11 case.  Varsalone Supp. Decl. ¶ 16.  Following this telephonic meeting, Mr. Moriarty, Debtor's

counsel, and the CRO discussed whether the Debtor should proceed with the financing option

obtained elsewhere or revisit accepting financing from Liberty on what they believed were

superior terms.  *Id.*

On November 17, 2017, during a meeting between Liberty, Liberty's counsel, Eoin

Moriarty, ACS' counsel, and the CRO (attending by telephone), Liberty expressed interest in

---

[6]         This meeting will be further discussed below in the context of the good faith purchaser requirements of
Section 363(m).

providing DIP financing and introduced the concept of a sale transaction with William Murphy as the potential purchaser. Varsalone Supp. Decl. ¶ 17. The CRO learned for the first time on that call that Mr. Murphy and Liberty had discussed potential sale terms, including a cash purchase price of $3 million and the assumption of approximately $11 million in liabilities. *Id*. In the CRO's experience, it was not odd or extraordinary for a party-in-interest to introduce a potential bidder into a sale process, so he was not surprised by Liberty's introduction of Mr. Murphy as a potential buyer. Varsalone Supp. Decl. ¶ 18. Thereafter, the CRO began negotiations with Liberty on DIP financing, the financial terms of which the CRO found to be vastly superior to the prior financing offered while containing similar sale milestones. *Id*. at ¶ 18. Additionally, at a contested cash collateral hearing on November 21, 2017, Liberty agreed to "backstop" the Debtor's use of cash collateral and thereafter issued a commitment to provide the DIP financing that the parties had discussed. Varsalone Supp. Decl. ¶ 19. On November 28, 2017, the Court approved the Liberty DIP financing on an interim basis, overruling the objections of the Union Funds, whose counsel flatly stated at the hearing that the Union Funds believed that for their purposes, the Debtor was better off dead. *Id*. at ¶ 20.

From November 29, 2017 through December 19, 2017, the CRO engaged in several telephone calls and email exchanges with William Murphy to discuss and negotiate the terms of a potential sale transaction. Varsalone Supp. Decl. ¶ 21. While conducting the requisite due diligence, the CRO was informed that Mr. Murphy had been introduced to Liberty by Donal O'Sullivan and that Mr. Murphy has business relationships with Mr. O'Sullivan and Padraig Naughton, which each consisted of a passive investment in a real estate development project in Florida. *Id*. Indeed, the investment by Mr. Murphy in the Florida project was disclosed up front by the Debtor in the Sale Motion, as was the fact that Donal O'Sullivan introduced Mr. Murphy to

Liberty. *See* Sale Motion ¶ 28. Neither Mr. O'Sullivan, nor anyone employed by or associated with Navillus, is an owner of, or has any interest in, the Purchaser. Varsalone Supp. Decl. ¶ 23.

The CRO noted that any purchaser of the Debtor must be satisfactory to Liberty as a surety for ACS' ongoing projects. Varsalone Supp. Decl. ¶ 24. The CRO testified that the fact that he was not involved in some initial discussions and meetings is only indicative of the fact that Mr. Murphy, a sophisticated business person, understood that a condition precedent to negotiating a transaction with the estate's fiduciary was first understanding whether or not the opportunity was even feasible. *Id.* In sum, Mr. Murphy learned of the opportunity from Mr. O'Sullivan, had some discussions with him and Liberty, and then negotiated the transaction with the CRO. *Id.*

On December 8, 2017, William Murphy, Patrick Murphy, their counsel, Liberty, its counsel, Eoin Moriarty, ACS' counsel, and the CRO participated in a meeting to discuss the terms and timeline for a sale of ACS' assets in detail. Varsalone Supp. Decl. ¶ 25. Mr. Murphy's initial offer to the CRO included (i) a cash component of $3.0 million, and (ii) assumed liabilities not to exceed $9.0 million. *Id.* at ¶ 26. The CRO subsequently determined that in order for the transaction to be worthwhile for the estate, the required cash component was approximately $4.0 million. *Id.* at ¶ 26. Mr. Murphy agreed to increase the cash component to $4.0 million. *Id.*

The CRO understood that that William Murphy and Patrick Murphy formed Trident shorstly after the December 8, 2017 meeting. Varsalone Supp. Decl. ¶ 27. Trident then executed a letter of intent on December 14, 2017, which included a purchase price with a cash component of $4.0 million and assumed liabilities of $9.0 million (which was $2 million less than the $11 million liability projected at that time). *Id.*

Thereafter, the CRO's team conducted further analysis on the assumed liabilities, projecting accounts payable information as of a closing date on January 31, 2018. Varsalone

Supp. Decl. ¶ 28. According to this analysis, accounts payable would be approximately $17.9

million at closing, or $6.9 million more than originally anticipated. *Id*. Their analysis did not

result in an increase in projected accounts receivable from approximately $24.0 million. *Id*. On

December 18, 2017, the CRO communicated this information to Mr. Murphy, and he agreed on

behalf of Trident to increase the assumed liabilities portion of the purchase price to account for

the additional anticipated accounts payable. Varsalone Supp. Decl. ¶ 29. On December 14, 2017,

ACS' counsel sent a proposed non-disclosure agreement to Trident's counsel, which was

executed by Trident on December 19, 2017. Varsalone Supp. Decl. ¶ 30. Trident was thereafter

provided with access to a due diligence data room with approximately 185 files, which was

available for review by all interested parties who agreed to execute a non-disclosure agreement.

Varsalone Supp. Decl. ¶ 30.

The CRO also compiled an initial diligence package for interested parties, which included:

(i) the November 30, 2017 monthly financial package; (ii) the fiscal year 2017 annual financials;

(iii) the DIP budget with supporting schedules; (iv) the equipment list and depreciation schedule;

(v) the stalking horse asset purchase agreement (the "APA"); and (vi) a summary roll forward of

material accounts receivable and accounts payable which the CRO prepared in connection with

negotiating the stalking horse asset purchase agreement. Varsalone Supp. Decl. ¶ 31. The CRO

represents that all interested parties had equal and ready access to the same information as the

stalking horse had in its initial diligence. *Id*.

On December 19, 2017, ACS and Trident executed the APA following the exchange of

several drafts and negotiated revisions. Varsalone Supp. Decl. ¶ 32. Following the CRO's

negotiations with Mr. Murphy, the total purchase price of cash and assumed liabilities increased by $8.9 million, or "approximately 170%" of what was originally offered.[7]  *Id.*

At or around the time of the filing of the Sale Motion, the CRO and his team also compiled a list of other potential strategic and financial investors to contact.  Varsalone Supp. Decl. ¶ 36.  In addition to the discussions with Mr. Murphy, the CRO contacted all fifteen parties that ACS' management identified as potentially interested, including eight known competitors of ACS.  Varsalone Supp. Decl. ¶ 34.  The CRO stated that although other parties from that group expressed initial interest, only William Murphy responded with a definitive proposal.  Varsalone Supp. Decl. ¶ 35.

The CRO also sought to actively involve the UCC by inviting its proposed financial advisor, Zolfo Cooper, LLC, to provide a list of additional parties that the UCC believed might have interest in acquiring the ACS' assets.  Varsalone Supp. Decl. ¶ 36.  The CRO represented that this was done not just to be transparent, but also to help ensure that ACS obtained the best possible price for its assets.  *Id.*  Zolfo Cooper provided a list of 25 parties and on December 27, 2017, the CRO contacted the parties from that list.  *Id.*  The CRO contacted 100 parties on or before December 27, 2017, and 106 parties in total, including 54 potential strategic investors and 52 potential financial investors.  Varsalone Supp. Decl. ¶¶ 36–37.  Each of these parties received (i) an executive summary, or "teaser" setting forth an overview of the transaction, summary financial information and relevant deadlines, and (ii) a copy of the *Order (a) Approving Bidding Procedures for the Sale of Substantially All of the Debtor's Assets* [ECF No. 150].  Varsalone Supp. Decl. ¶ 38.

---

[7]        While the increase in cash and assumed liabilities may not be suitable for an apples-to-apples comparison, both are substantial improvements for the Debtor.

All potential bidders were required to execute a non-disclosure agreement in order to gain access to the Data Room. *Id.* Six parties requested that the CRO send a proposed non-disclosure agreement and four ultimately executed and returned one. *Id.* Those four parties have engaged in active diligence, including either multiple discussions with the CRO and/or management, and/or reviewing documents in the Data Room. *Id.* Of the four, one requested a meeting with management, but ultimately passed on the opportunity after a call with ACS' management and the Zolfo Cooper on January 18, 2018. *Id.* One other party proposed an alternative purchase structure with a pay out over time. *Id.* The CRO consulted with Zolfo Cooper regarding this offer, after which it was decided that the structure was not feasible and was inferior to the offer made by the stalking horse Trident. *Id.*

The CRO states that 34 parties have responded by informing him that they are passing on the opportunity. Varsalone Supp. Decl. ¶ 40. The other 72 parties have not responded as of yet, but each of the parties nonetheless received no fewer than four communications from the CRO regarding the opportunity, and each received the "teaser," the Bidding Procedures Order and a final reminder one week in advance of the bid deadline. *Id.*

The CRO represents that throughout the process, he has regularly updated the UCC, through its financial advisor, regarding the status and scope of the marketing process, has continually sought their input on marketing strategy, and has encouraged them to let him know of any other potentially interested parties. Varsalone Supp. Decl. ¶ 41.

It was raised in these proceedings that Liberty has made financing available to the stalking horse bidder in conjunction with the sale transaction, but not to other potential investors. Cement Workers Final Objection ¶ 76. The CRO represents that it is routine and customary for a capital provider to agree to capitalize a stalking horse bidder and not offer capital support to other

potential bidders.  Varsalone Supp. Decl. ¶ 39.  The CRO also represents that no other potential

bidders progressed far enough into the process to engage in such discussions with Liberty.  *Id*.

The CRO testified that the failure to disclose Liberty's partial finance of Trident's acquisition was

never hidden from any party and that there was never any indication that the disclosure of that

fact would have led to the submission of a competing offer.  *Id*.   Given these facts, the Court

concludes that the involvement of Liberty as a financing party to Trident does not render the sale

process fatally flawed or invalidate the business judgment exercised by the CRO as to the sale.

The CRO represents that despite the efforts of himself, his CBIZ team, and ACS and its

management to find offers higher and better than that of Trident, none were received.  Varsalone

Supp. Decl. ¶ 42.   Accordingly, no auction was convened and ACS is proceeding with the sale

transaction.  *Id*.  The CRO has received no indication that even if it were an option, that an altered

or elongated sale process would result in anything different.  *Id*.  In the CRO's experience, a

stalking horse bid attracts competing bids when it is below market and is unlikely to attract

competing bids when it approximates fair market value and the CRO believes the stalking horse

bid approximates the fair market value of the Debtor's assets.  *Id*.  Thus, in his opinion, it is

highly unlikely that extending the process or expanding the investor list would yield a different

result.  *Id*.

### 3.   The Sale is in the Best Interest of the Debtor, its Estate and its Stakeholders

The Court finds that the sale transaction is clearly in the best interest of the Debtor's estate

and its creditors.

According to the CRO, the sale transaction between ACS and Trident allows ACS' estate

to:

- realize $3.725 million in cash (reduced from $4 million due to a credit paid by a commercial partner terminating one of the Debtor's jobs); this cash will allow ACS'

estate to satisfy its obligations to its secured lenders, including approximately $1 million to Signature Bank, $2.5 million to Liberty as its DIP lender, and $450,000 to Wells Fargo affiliates;

- retain as much as $2 million in cash excluded from the Sale Transaction;

- avoid the failure to pay as much as $17.9 million in liabilities, much or all of which are 3A liabilities, to be assumed by Trident;

- avoid defaulting under its surety bonds and construction contracts by requiring Trident to assume ACS' obligations under its construction contracts and complete ongoing construction projects; and

- save the jobs of most of ACS' 450 employees who Trident intends to employ.

Varsalone Supp. Decl. ¶ 43.

Thus, if the sale transaction is consummated, the CRO believes ACS will have cash on hand as of February 2, 2018, in the amount of approximately $6.212 million. Varsalone Supp. Decl. ¶ 45. ACS would have sufficient cash to satisfy all secured claims, administrative claims and priority claims, not including any administrative claims allegedly held by the Union Funds. *Id*. As a result of Trident's assumption of liabilities owed to holders of Article 3A rights and project related administrative costs, ACS would have approximately $1.5 million in cash on hand to fund a Chapter 11 plan after payment in full of secured claims, administrative claims through the sale, and priority claims, and would permit the estate to fund ongoing appeals and litigation, to pursue any potential insider avoidance actions for the benefit of general unsecured creditors, and provide a meaningful distribution to general unsecured creditors. *Id*.

By contrast, the CRO believes that if the sale transaction is not consummated, ACS will have insufficient cash available to operate its business after January 31, 2018, including an inability to make insurance premium payments of approximately $840,000 due on February 1, 2018, and an additional approximately $450,000 in operating expenses in the first week of February 2018. Varsalone Supp. Decl. ¶ 46. Consequently, ACS will have to cease doing business with no ability to recover outstanding receivables. *Id*. Such a result would leave ACS

44

with estimated unpaid secured claims totaling approximately $2.19 million, and estimated unpaid

administrative and priority claims of not less than $840,000.  *Id*.  Such a scenario would also

result in unsatisfied liabilities to holders of Article 3A lien rights and project related

administrative liabilities in the amount of approximately $19.47 million, and significant additional

liabilities to contract parties and sureties including Liberty.  *Id*.  There would be no recovery to

general unsecured creditors and the general unsecured creditor claims pool would swell

tremendously.  *Id*.  The jobs of the 450 employees of ACS would not be preserved.  Varsalone

Supp. Decl. ¶ 50.

### B.  <u>Good Faith Purchaser Under Section 363(m)</u>

The Court finds that good faith purchaser protections should be extended to

Trident under Section 363(m) of the Bankruptcy Code.

Section 363(m) provides that:

[t]he reversal or modification on appeal of an authorization under subsection (b) or
(c) of this section of a sale or lease of property does not affect the validity of a sale
or lease under such authorization to an entity that purchased or leased such
property in good faith, whether or not such entity knew of the pendency of the
appeal, unless such authorization and such sale or lease were stayed pending
appeal.

11 U.S.C. § 363(m).

Section 363(m) is meant "to maximize the sale price of estate assets by providing

assurances to the purchaser of the finality of the sale by eliminating the prospect of litigation

concerning claims to the property."  *In re GSC, Inc.*, 453 B.R. 132, 180 (Bankr. S.D.N.Y. 2011)

(quoting *Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 385 (2d Cir. 1997)).

A "good-faith purchaser" is "one who purchases the assets for value, in good faith and

without notice of adverse claims."  *In re GSC, Inc.*, 453 B.R. at 180.  "A purchaser's good faith is

shown "by the integrity of his conduct during the course of the sale proceedings."  *Id*.  "The

absence of good faith is shown by fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *Id*.

A good-faith analysis examines "the purchaser's conduct in the course of the bankruptcy proceedings[,] . . . [which includes] the purchaser's actions in preparation for and during the sale itself" *Id*. "The purchaser is prohibited from engaging in any fraudulent or collusive actions that are specifically intended to affect the sale price or control the outcome of the sale." *Id*. at 180–81. "Thus, notwithstanding the timing of the questionable conduct, the relevant inquiry [remains] whether that conduct was intended to control the sale price or take unfair advantage of prospective bidders." *Id*. at 181.

The primary basis for the arguments made against a good faith finding are the relationship and communications between William Murphy and Donal O'Sullivan during the sale process. The implication appears to be that there is a secret agreement between the two men regarding the sale transaction and the UCC goes so far as to contend that the testimony of Donal O'Sullivan and William Murphy about their communications should be considered not credible. The Court, however, finds several problems with respect to the Objectors' position.

First, the Court is mindful of the determination in the District Court Decision that the testimony of Donal O'Sullivan was not truthful on several key points. Give that finding and the Court's own resulting concern, the Court has not relied upon the testimony of Donal O'Sullivan for any issue in this case. Instead, it has looked to other evidence on this issue, most notably the testimony of William Murphy. The Court finds Mr. Murphy to be a credible witness for many reasons, including his demeanor at trial. The Court concludes that he has little reason not to tell the truth in this matter. While a friend of Donal O'Sullivan, William Murphy comes to this transaction as an individual who does not exist in the shadow of Donal O'Sullivan and Navillus,

unlike Eoin Moriarty who worked under Donal O'Sullivan for years and clearly considers Donal O'Sullivan to be his mentor. Rather, William Murphy is very much his own man, one who has a real estate business in Florida unrelated to Donal O'Sullivan. There is no evidence that William Murphy has done any construction work with Donal O'Sullivan or Navillus. The only evidence of a business involvement between William Murphy and Donal O'Sullivan is one real estate investment in Florida. And that deal appears to have been done on terms as equals, rather than having William Murphy in any dependent position to Donal O'Sullivan (financial or otherwise). Additionally, the investment by Mr. Murphy in the Florida project with Donal O'Sullivan was disclosed up front by the Debtor in the Sale Motion, as was the fact that Donal O'Sullivan introduced Mr. Murphy to Liberty. *See* Sale Motion ¶ 28.

Mr. Murphy's testimony demonstrated that he was making his own decisions with respect to the sale transaction for his own reasons—to set up a business for his son—and he provides a credible narrative of the communications between the two men during November and December.

Mr. Murphy testified that he first learned of the potential opportunity to purchase the assets of ACS on or about November 14, 2017 when he was contacted by Donal O'Sullivan by telephone. William Murphy Decl. ¶ 8. Mr. O'Sullivan asked Mr. Murphy to meet with him and Liberty. *Id*. At that time, Mr. Murphy understood that Liberty was the surety with respect to several performance and payment bonds it issued on certain of ACS' construction contracts. *Id*. On November 16, 2017, Mr. Murphy met with Liberty and Donal O'Sullivan among others to discuss the possibility of purchasing certain of ACS' assets. William Murphy Decl. ¶ 9. The evidence establishes that the CRO and ACS were not aware of or present at this meeting and that Mr. Murphy and Liberty discussed potential business terms of a sale transaction, including a cash purchase price in the amount of $3 million and the assumption of liabilities in the approximate

amount of $11 million.  Varsalone Supp. Decl. ¶ 17.  But the CRO testified that in his experience,

it was not odd or extraordinary for a party-in-interest to introduce a potential bidder into a sale

process, so he was not surprised by Liberty introducing Mr. Murphy as a potential deal partner.

Varsalone Supp. Decl. ¶ 18.  Indeed, the CRO noted that any purchaser of the Debtor must be

satisfactory to Liberty as a surety on behalf of ACS' ongoing projects.  Varsalone Supp. Decl. ¶

24.  The CRO indicated that the fact that he was not involved in some initial discussions and

meetings is only indicative of the fact that Mr. Murphy—a sophisticated business person—

understood that a condition precedent to negotiating a transaction with the estate's fiduciary was

first understanding whether or not the opportunity was even feasible.  *Id.*  Mr. Murphy learned of

the opportunity from Mr. O'Sullivan, had some discussions with him and Liberty, and then

negotiated the transaction with the CRO.  *Id.*

  Thus, shortly after the November 16th meeting, Mr. Murphy was introduced to the CRO

on a telephone call set up by Liberty.  William Murphy Decl. ¶ 10.  And Mr. Murphy testified that

from that point forward, Mr. Moriarty, Mr. Varsalone and Mr. Murphy engaged in various

telephone calls and exchanged a number of emails to further discuss the structure of a possible

sale transaction.  *Id.*

  Regardless of the initial communications between William Murphy, Donal O'Sullivan,

and Liberty regarding the sale, the CRO quickly took control of the sale process, consistent with

the sentiment he expressed in an email stating that Liberty and William Murphy could not be

permitted to negotiate their own deal.  Objectors Trial Exhibit 2 at TGC 3342.

  On December 8, 2017, Patrick Murphy and William Murphy, along with their counsel,

met with Eoin Moriarty, Jeffrey Varsalone, ACS' counsel, Liberty, and Liberty's counsel.

William Murphy Decl. ¶ 11; Patrick Murphy Decl. ¶ 11 [ECF No. 217-2].  Mr. Murphy testified

that during that meeting, the parties discussed a timeline for a sale transaction, including among other things, timelines for completing a letter of intent and completing an asset purchase agreement.  William Murphy Decl. ¶ 11.

Mr. Murphy testified that subsequent to the November 16, 2017 meeting with Liberty and Donal O'Sullivan, he did not have any further communication with Donal O'Sullivan regarding the purchase of any of ACS' assets until on or around December 18, 2017.  William Murphy Decl. ¶ 12.  At that time, Mr. Murphy contacted Donal O'Sullivan by email because he wanted to get his input as to the value of ACS and whether the purchase price Mr. Murphy had agreed to pay was reasonable.  *Id*.  Mr. Murphy testified that he reached out to Mr. O'Sullivan because Mr. O'Sullivan was a friend, was the person that introduced Mr. Murphy to the opportunity with ACS, and had extensive construction experience.  *Id*.  Mr. Murphy testified that on December 18th, he emailed Donal O'Sullivan certain ACS financial information that Mr. Murphy had received from Mr. Varsalone, including projections relating to ACS' ongoing jobs.  *Id*.  A few days later Mr. Murphy had a telephone call with Donal O'Sullivan in follow up to his email.  *Id*.  Mr. Murphy testified that he had no other communications with Donal O'Sullivan regarding the purchase of ACS' assets.  William Murphy Decl. ¶ 13.  On December 19, 2017, ACS and Trident executed the APA.  William Murphy Decl. ¶ 14.

In summary, the credible evidence establishes that Donal O'Sullivan sought out a party that might be interested in engaging in a transaction, which is exactly what he was asked to do at the November 9, 2017 meeting, at which the CRO was present.  Varsalone Supp. Decl. ¶¶ 12–13.  Mr. Murphy may have consulted with Mr. O'Sullivan regarding the purchase price.  But crucially, the Court notes that all the credible evidence demonstrates that the terms of the sale were not dictated by Donal O'Sullivan.  Indeed, the evidence previously discussed by the Court with

49

respect to the sale process clearly establishes that Mr. Varsalone negotiated the sale on behalf of

the Debtor in an arms-length transaction.    The price paid by Trident, in fact, went up at the

insistence of Mr. Varsalone, and William Murphy testified at trial that he believed he may have

overpaid for the assets of ACS.  Mr. Murphy's initial offer communicated to the CRO included (i)

a cash component of $3.0 million, and (ii) assumed liabilities not to exceed $9.0 million.

Varsalone Supp. Decl. at ¶ 26.  The CRO subsequently determined that in order for the

transaction to be worthwhile for the estate, the required cash component was approximately $4.0

million and Mr. Murphy agreed to that increase.  *Id*. at ¶ 26.

Thereafter, the CRO's team conducted further analysis on the assumed liabilities, finding

that accounts payable would be approximately $17.9 million at closing, or $6.9 million more than

originally anticipated.  *Id*.  at ¶ 28.  They also further analyzed accounts receivable, but did not

increase the projected amount of approximately $24.0 million.  *Id*.  On December 18, 2017, the

CRO communicated this information to Mr. Murphy, who then agreed on behalf of Trident to

increase the assumed liabilities portion of the purchase price to account for the additional

anticipated accounts payable.  Varsalone Supp. Decl. ¶ 29.  Through the CRO's negotiations with

Mr. Murphy, the total purchase price increased by $8.9 million or, as the CRO has explained,

"approximately 170%" of what was originally offered.  *Id*. at ¶ 32.  The Court finds the

significant increase in cash and close to doubling of assumed liabilities to be extremely significant

in this case.

The evidence establishes that Mr. Murphy and Mr. O'Sullivan did have contact with

respect to the sale.  But the fact that Mr. Murphy consulted Mr. O'Sullivan on whether he got a

good deal supports the fact that Mr. O'Sullivan was not the one that dictated the sale price.  The

Objectors point to a high priority email sent by Mr. O'Sullivan's secretary to Mr. Murphy on

December 8, 2017, asking Mr. Murphy to contact Mr. O'Sullivan.  But Mr. Murphy testified at

trial that the two did not connect at that time.  The Objectors also point to an email Mr. Murphy

sent to Mr. O'Sullivan's secretary at her personal email address, which included financial

information relating to ACS.  But Mr. Murphy testified that he contacted Donal O'Sullivan

because he wanted to get his input as to the value of ACS and whether the purchase price Mr.

Murphy had agreed to pay was reasonable.  William Murphy Decl. ¶ 12.  He further testified at

trial that he contacted Mr. O'Sullivan's secretary because he wanted to hear back right away and

Mr. O'Sullivan did not always respond promptly to emails.  He further testified at trial that the

secretary's personal email address popped up in his email browser because he had emailed her

before.  No credible testimony was presented to contradict Mr. Murphy's narrative, or to impugn

his credibility.  Nor does the Court find the use of a personal email here to mean much of

anything.

    The Court notes that the inquiry with respect to the actions of a good faith purchaser

relates primarily to whether the conduct of the purchaser has had an impact on the bidding

process.  Specifically, "[t]he absence of good faith is shown by fraud, collusion between the

purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other

bidders."  *In re GSC, Inc.*, 453 B.R. at 180 (quoting *In re Gucci*, 126 F.3d at 390).  "The

purchaser is prohibited from engaging in any fraudulent or collusive actions that are specifically

intended to affect the sale price or control the outcome of the sale."  *Id*. at 180–81.  "Thus,

notwithstanding the timing of the questionable conduct, the relevant inquiry [remains] whether

that conduct was intended to control the sale price or take unfair advantage of prospective

bidders."  *Id*. at 181.

But this Court finds that no evidence has been put forward establishing that William Murphy or Patrick Murphy engaged in any conduct that was meant to control the sale price or take advantage of other prospective purchasers. The Objectors point to the fact that Liberty agreed to finance part of Trident's purchase and that this was unknown to other potential purchasers. But with respect to Liberty providing financing to the stalking horse bidder and that financing not being made available to other potential investors, the CRO represented that it is routine and customary for a capital provider to agree to capitalize a stalking horse bidder and not offer capital support to other potential bidders. Varsalone Supp. Decl. ¶ 39. The CRO also represented that no other potential bidders progressed far enough into the process to engage in such discussions with Liberty. *Id*. The CRO also concluded that there was never any indication that the disclosure of Liberty's financing would have led to the submission of a competing offer. *Id*.

Both William and Patrick Murphy testified that they did not have any communications with any person who has expressed an interest in purchasing any of the assets of ACS, and that they in no way impeded ACS' ability to search for and try to obtain offers for its assets superior to that of Trident. William Murphy Decl. ¶ 23; Patrick Murphy Decl. ¶ 19.

They further testified that they did not collude with anyone to manipulate the purchase price for ACS' assets or to have any effect on any other person's interest in purchasing the assets of ACS, or otherwise chill bidding. William Murphy Decl. ¶¶ 24–25; Patrick Murphy Decl. ¶¶ 20–21.

Both William and Patrick Murphy testified that they believe the purchase price Trident has agreed to pay, which was subject to higher and better offers, was at least equivalent to, if not more than, the fair market value of the assets being purchased from ACS. William Murphy Decl. ¶ 26;

Patrick Murphy Decl. ¶ 22.  They further testified that the purchase price was negotiated between Jeffrey Varsalone and William Murphy at arm's length over a period of weeks and noted that, as discussed above, Trident agreed to increase the cash component of the sale price by one-third, or $1 million, and doubled the amount of assumed liabilities.  William Murphy Decl. ¶ 27; Patrick Murphy Decl. ¶ 23.

William and Patrick Murphy also testified that neither they nor Trident offered to provide or agreed to provide any ownership interest in Trident to anyone or otherwise share profits from Trident's operations with anyone including, but not limited to, Donal O'Sullivan, Kevin O'Sullivan, Padraig Naughton, Michael Brewster, Eoin Moriarty, William O'Donnell, or anyone else affiliated with Navillus or ACS.  William Murphy Decl. ¶ 29; Patrick Murphy Decl. ¶ 25.  Nor have William or Patrick Murphy, or Trident offered or reached an agreement to provide employment to any person in exchange for any type of preferred treatment in the sale process.  William Murphy Decl. at ¶ 30; Patrick Murphy Decl. at 26.  Both William and Patrick Murphy testified that there were no undisclosed agreements or understandings regarding the equity of Trident with any owner or employee of ACS or Navillus.  William Murphy Decl. at ¶ 31; Patrick Murphy Decl. at ¶ 27.  The Court has found no evidence to the contrary with respect to these statements.[8]

---

[8]    At the end of its delivery of the bench ruling, the Court addressed various miscellaneous items not directly relevant to core issues underlying the decision.  Those items have been omitted here for brevity and clarity.

## <u>CONCLUSION</u>

For the reasons stated above, the Court finds that Debtor is not an alter ego of Navillus, that Trident is a good faith purchaser under Section 363(m), and that the sale transaction reflects an exercise of sound business judgment by the Debtor.  Accordingly, the Court approves the sale transaction.

Dated: New York, New York
January 31, 2018


_/s/ Sean H. Lane_____
UNITED STATES BANKRUPTCY JUDGE